**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| BRADLEY RAY CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-178-JED-FHM |
| | ) | |
| JOHN DAVIS; CHRISSIE UNDERWOOD; | ) | |
| MIKE WATERS; AND BRET BOWLING; | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

### I.   Background

This case arises from the arrest and prosecution of Plaintiff, Bradley Ray Carter (Bradley or Plaintiff), on allegations that he sexually abused C.W., a six-year old girl who at one time was Bradley's stepdaughter.

Between the fall of 2009 and December, 2011, Bradley and C.W.'s mother, Amanda, lived with Bradley's mother and brother (Daniel) in a house in Pawnee County, Oklahoma.  From late 2011 until April 2012, Bradley, Amanda, and C.W. lived with Amanda's mother, Krista, in Creek County, Oklahoma.  In April 2012, Bradley and Amanda separated, and Bradley moved to a different home.

#### *The Initial Report of Sexual Abuse to Creek County*

On June 21, 2012, Amanda, C.W., and Amanda's mother (Krista) and grandmother (Bonnie) went to the Creek County Sheriff's Office (CCSO) to report that C.W. had been sexually assaulted.  They spoke to Deputy Chrissie Underwood.  Amanda informed Underwood that C.W. had reported to Krista that Bradley previously used his finger, his "hoohoo," and a pink vibrator, to touch C.W.  (Creek County Aff., Doc. 49-3, 49-5). Amanda gave a written statement, reporting

that C.W. disclosed on June 20 and 21, 2012 that "Brad" had touched her with his fingers, a pink vibrator, and his "whowho," and "it happened a lot." (Doc. 49-5).[1]

Deputy Underwood spoke with John Davis, who at the time was a detective in investigations for the CCSO, about performing a forensic interview.[2] Underwood conducted a videotaped forensic interview with C.W. The Court has reviewed Deputy Underwood's video interview of C.W. (*see* Doc. 78-3). Underwood was certified by the Council on Law Enforcement Education and Training and had received training on child abuse investigations. She had received specific training on performing forensic interviews and had conducted more than 100, including interviews regarding alleged sexual assaults of children.

During the interview, C.W. identified on female and male diagrams various anatomical parts, including eyes, lips, belly button, back, arms, legs, nose, knees, head, "boobs," "butt," and "hoo hoo." (Doc. 78-3). C.W. disclosed that Bradley used his index finger, his "hoo hoo," and a pink vibrator to touch her. She said that he put his "hoo hoo" inside of her. (*See id.*; *see also* Doc. 49-3). C.W. stated that one incident occurred at Grandma's (Krista's) house "in Ashley's old room." (Doc. 78-3). C.W. identified Ashley as her mom's sister and thus as C.W.'s aunt. (*Id.*). She further reported that other instances of the sexual contact occurred in her "mom and Brad's room" at Daniel's house. (*Id.*). C.W. indicated that it happened more than three times and "a lot," and that Bradley told her not to tell anybody or he would get thrown in jail. (*Id.*).[3]

---

[1]    It is undisputed that "Brad" refers to Plaintiff Bradley Carter, and that "hoohoo" and "whowho" refer to C.W.'s term for genitals.

[2]    Davis became Sheriff of Creek County on January 1, 2013. Bret Bowling subsequently replaced Davis as Sheriff and was substituted in his official capacity in this case in January 2017. (*See* Doc. 74).

[3]    Daniel Carter is Plaintiff's brother. C.W. resided in a home with Daniel Carter, Bradley, Amanda, and Bradley's mother, from sometime in 2009 to the end of 2011.

After the forensic interview, Underwood spoke again with Amanda and with Amanda's mother, Krista. Amanda subsequently brought a pink vibrator to the CCSO. Underwood contacted Bradley via phone, but Bradley refused to speak with Underwood on the advice of Bradley's father, Gary Carter, who is a police officer.

On July 6, 2012, Deputy Underwood signed a Probable Cause Affidavit for Arrest Warrant, which described the information that she had received from talking to Amanda and interviewing C.W., including that Bradley had put his "hoo hoo" inside of her and touched her with his finger and a pink vibrator. (Doc. 49-3).[4] On July 19, 2012, based on the probable cause affidavit, a Creek County district judge issued a felony warrant for Bradley's arrest for the offense of child sexual abuse in violation of *Okla. Stat.* tit. 21, § 843.5(E). (Doc. 49-13). Bond was set at $100,000. (*Id.*). On July 29, 2012, Bradley was taken into custody pursuant to the Creek County warrant. He was incarcerated for five days at the Creek County Detention Center and was released on bond on August 3, 2012.

### Investigation by the Jennings Police Department and Pawnee County

Sometime after she met with Amanda, Krista, and C.W. on June 21, 2012, Deputy Underwood contacted the Jennings Police Department to report her belief that some of the alleged abuse may have occurred in the City of Jennings. On June 28, 2012, Amanda provided a voluntary written statement to the Jennings Police Department, reporting C.W.'s statements about being touched by Bradley with his fingers, vibrator, and "ho ho," and that at least one incident happened at their "old house" in Jennings. (Doc. 49-9). Krista also provided a written statement to the

---

[4]    Plaintiff asserts that Underwood's probable cause statement "is the product of a fatally flawed, biased and unconstitutional investigation." (Doc. 61 at 10). However, Plaintiff's response brief does not specifically controvert the facts stated in the affidavit. Accordingly, the facts recited herein as to the affidavit are undisputed or deemed admitted for the purpose of summary judgment. *See* LCvR 56.1(c).

Jennings Police Department, describing C.W.'s June 20 and 21, 2012 allegations of prior sexual abuse by Bradley. (Doc. 49-10).

On July 2, 2012, the Jennings Police Department referred its investigation to the Pawnee County Sheriff's Office (PCSO) after determining that Daniel's house, where CW stated that some of the sexual abuse had occurred, was outside Jennings city limits, in Pawnee County. Nick Mahoney, a PCSO Deputy, spoke with CCSO Deputy Underwood on July 2, 2012 and received Underwood's files on the case. Deputy Mahoney also reviewed a video of Underwood's forensic interview of C.W. On July 9, 2012, Mahoney interviewed Amanda and Krista, who again described C.W.'s report that Bradley had sexually abused her. Amanda also told Mahoney that no other men had been in a position to abuse C.W. (Doc. 49-11 at 12 [Dep. p. 39:15-22]).

On July 20, 2012, Amanda signed a statement affirming the accuracy and truth of the information she had provided to Deputy Mahoney at the PCSO. (Doc. 49-14). On July 23, 2012, Mahoney submitted an Arrest Warrant Affidavit in Pawnee County, for first degree rape and rape by instrumentation (Doc. 49-12). That affidavit referenced statements by Underwood, Amanda, and Krista in support of probable cause. (*Id.*). Mahoney's probable cause narrative also stated that he "attempted contact with Bradley Carter but he stated he did not want to speak with me with or without an attorney." (*Id.*). In his deposition, Mahoney indicated that Bradley's father Gary told Mahoney that Bradley did not want to speak with him. (Doc. 67-2 at 2-3).

On August 14, 2012, based on Deputy Mahoney's Affidavit, Pawnee County District Judge Matthew Henry issued a felony warrant for Bradley's arrest for the offenses of lewd molestation, rape by instrumentation, first degree rape, and intimidation of a witness. (Doc. 49-16). On August 20, 2012, Bradley turned himself in and posted bail at the Pawnee County Jail.

*Creek County Pretrial Proceedings*

On December 13, 2012, Creek County Judge Richard A. Woolery held a preliminary hearing in Bradley's Creek County case. Judge Woolery heard testimony from Underwood and viewed a DVD of the forensic interview. C.W. also testified during the preliminary hearing. C.W. identified Bradley and Deputy Underwood in the courtroom, and C.W. testified that Underwood had asked her some questions in a room and that C.W. had told Underwood the truth. C.W. testified that she did not remember what she told Underwood and that she did not "remember *today* Brad doing anything not nice" to her. (Doc. 49-17 at 35 [emphasis added]).[5]

While C.W. did not or would not repeat her specific allegations in a courtroom, the balance of her testimony indicated that (1) she remembered reporting to her grandmother that Bradley did something "not nice" to her, (2) she repeated that information to her mother, and (3) she also recalled telling Deputy Underwood the same information. (Doc. 49-17 at 32-36). As noted, she also testified that she told Underwood the truth during the interview. (*Id.* at 28).

Judge Woolery found that C.W. was qualified to testify and determined that Bradley should be bound over for trial:

> At the preliminary hearing level, the Court is required to take the evidence presented in the light most favorable to the State, and further I'm required to presume that the State will strength[en] its case at trial. And based on that, this Court will find that the State has met its burden of proof and shown probable cause to believe that the crime alleged has been committed and further shown probable cause to believe that this defendant committed said crime. He therefore will be bound over for trial in the District Court.

(Doc. 49-17 at 40-41).

---

[5]     The qualifier, "today," in the question renders it less than clear. Bradley's Complaint highlighted that question and answer, but omitted the word "today" from the question asked. (Doc. 1 at ¶ 26).

On February 25, 2013, at a suppression hearing before Judge Sam Vassar in Creek County, during cross-examination by Bradley's counsel, Deputy Underwood testified as follows regarding her conversations with Amanda during her investigation:

Q:   Okay. Did mother ever tell you that she thought that it could have been someone else?

A:   Yes. . . .

Q:   Okay. Did you investigate the person that mother told you that it could have been?

A:   She didn't give me a name.

Q:   Okay. Did you ask her for a name?

A:   All she told me was that she thought maybe it could have been somebody else. That was it. She didn't give me any other information. . . .

Q:   When did you have the conversation with mom about it could have been someone other than Brad?

A:   When she brought in the vibrators.

Q:   Okay. . . . How long after was that?

A:   I want to say it was two days after but I would have to pull the original property sheet.

(Doc. 49-19 at 23-26).

Judge Vassar watched the video of the forensic interview and noted that "the procedure with the child was somewhat more leading than I'm used to, although more leading is expected with the younger children. . . . And the areas where the child testified to the meat of the matter, the child always testified spontaneously and evidently in agreement, because nothing to the contrary was presented, with the prior reporting to family members. And I saw nothing about the mental condition of the child that caused me any questions." (*Id.* at 38). Judge Vassar further noted, "I was somewhat concerned that we did not follow up the question of whether or not there was a motive to influence the child, because the child does mention in the statement 'mama's former

6

husband' or something. . . . But I felt that the leading questions by and large were in a non-critical area and they followed the child revealing something." (*Id.*).

### Dismissal of Criminal Charges

At the conclusion of the February 25, 2013 suppression hearing, Judge Vassar found that the forensic interview was admissible as evidence. (*Id.* at 39). However, he raised the issue of Bradley's right to cross-examine and ordered the parties to supply briefs on the issue. (*Id.*). Judge Vassar subsequently dismissed the case on March 28, 2013. (*See* Doc. 49-20).[6] The Pawnee County District Attorney also moved to dismiss its criminal case against Bradley without prejudice on May 30, 2013. (Doc. 49-21).

### Bradley's Claims

On April 15, 2014, Bradley filed the Complaint in this action. (Doc. 1). He alleges that he was wrongfully arrested, incarcerated, and/or prosecuted, and asserts claims pursuant to 42 U.S.C. § 1983 and Oklahoma law. Plaintiff's Complaint named Davis, in his individual and official capacities; Underwood; Pawnee County Sheriff Mike Waters, in his official capacity; and Pawnee County Sheriff's Deputy Mahoney. On October 27, 2014, Mahoney was dismissed by stipulation. Motions for summary judgment were filed by Underwood (Doc. 49), Davis (Doc. 50), and Waters (Doc. 52). As noted above, Bret Bowling, who replaced Davis as sheriff, has been substituted for Davis in his official capacity. Thus, Underwood and Davis are sued in their individual capacities,

---

[6]     The parties disagree as to the reason for the dismissal of the Creek County proceeding. Bradley contends the case was dismissed because Judge Vassar found Bradley had a right of confrontation and cross-examination of C.W., citing a docket entry that notes, "Right of confrontation issue." (Doc. 49-20). Plaintiff contends, without citing further evidence, that "[i]t is not entirely clear why Judge Vassar ultimately dismissed the case." (Doc. 61 at 14). The typewritten minute sheet reflecting dismissal indicates that a hearing was held on March 27, 2013 on "Right of confrontation issue," but handwritten notes reported the "motion denied." (Doc. 49-20). At the same time, another notation states, inconsistently, "Motion to Quash sustained. Dismissed Cost to State." (Doc. 49-20).

and Bowling and Waters are sued in their official capacities. Underwood and Davis assert their respective entitlement to qualified immunity as to Bradley's individual-capacity § 1983 claims.

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

## III.     Underwood's Motion for Summary Judgment

Bradley's Complaint asserts claims under 42 U.S.C. § 1983, alleging that Deputy Underwood, in her individual capacity, violated the Fourth Amendment by wrongful arrest and malicious prosecution. Bradley also asserts tort claims under the Oklahoma Governmental Tort Claims Act (GTCA) and asserts that Underwood violated the Oklahoma Constitution. Bradley represents in his response brief that he does not and has never intended to bring any state law tort claim against Underwood. (Doc. 61 at 28 of 30).

### A.     Section 1983 Claims

Deputy Underwood asserts that she is entitled to qualified immunity on Bradley's claims under 42 U.S.C. § 1983. The general summary judgment standards apply to motions for summary judgment based on qualified immunity. Accordingly, courts must still draw the evidence and

reasonable inferences in favor of the non-moving party. *See Tolan v. Cotton*, 572 U.S. 650, 656-60 (2014); *Scott v. Harris*, 550 U.S. 372, 377 (2007). In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Tolan*, 572 U.S. at 655-56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008).

The second prong asks "whether the federal right was clearly established at the time of the violation." *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). In this Circuit, once qualified immunity is raised by a defendant, the burden shifts to the plaintiff to meet the "heavy two-part burden." *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995); *see also Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015).

Government officials are shielded from liability if their actions did not violate clearly established federal rights "of which a reasonable person would have known." *Tolan*, 572 U.S. at 656 (quoting *Hope*, 536 U.S. at 739). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In support of his Fourth Amendment claims against Deputy Underwood for unlawful arrest and malicious prosecution, Bradley contends there was no probable cause to support his arrest in

Creek County because (1) there is evidence that Amanda told Underwood that she thought someone else, rather than Bradley, could have abused C.W., but Underwood failed to follow up on the statement or include it in her probable cause affidavit; and (2) Underwood's investigation was so flawed, biased, and deficient that it could not have produced reasonably trustworthy information to support probable cause.

A law enforcement official violates the Fourth Amendment by knowingly, or with reckless disregard for the truth, making a false statement in a warrant affidavit, or knowingly or recklessly omitting from the affidavit information that, if included, would vitiate probable cause. *See, e.g., Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990); *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991) (citing cases). In such cases, the Court "measure[s] probable cause by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes probable cause for the warrant." *Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015) (citing *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996)). Thus, the Court must determine whether Deputy Underwood's affidavit would establish probable cause for Bradley's arrest if it had included omitted information that Bradley alleges was material.[7]

"Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Cortez v. McCauley*, 478 F.3d 1108, 116 (10th Cir. 2007) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 n.2 (2003)). "The standard of probable cause does not require indubitable or necessarily convincing evidence, but only so much 'reasonably trustworthy information' as 'to warrant a prudent man in believing that the [arrestee

---

[7]     Bradley does not contend that Underwood made any false statements in her affidavit.

has] committed . . . an offense." *Easton v. City of Boulder, Colo.*, 776 F.2d 1441, 1450 (10th Cir. 1985); *see also Shed v. Okla. Dep't of Human Servs.*, 729 F. App'x 653, 657 (10th Cir. 2018) (unpublished) (quoting *Easton*, 776 F.2d at 1450 and affirming summary judgment for defendants on § 1983 malicious prosecution claim following the plaintiff's acquittal on charges that he sexually abused his five-year-old stepdaughter). The Supreme Court "has long held that 'the term 'probable cause' . . . means less than evidence which would justify condemnation,' and that a finding of 'probable cause' may rest upon evidence which is not legally competent in a criminal trial." *Easton*, 776 F.2d at 1450 (internal citations and alterations omitted).

In her affidavit, Deputy Underwood cited the following sources of evidence for probable cause to arrest Bradley: (1) Amanda's report to Underwood that C.W. disclosed sexual abuse by her stepfather; (2) Amanda's written statement that C.W. reported to her grandmother that Bradley had touched her with his finger, his "hoo hoo," and a pink vibrator; and (3) information from Underwood's interview of C.W. on June 21, 2012, in which C.W. reported sexual abuse by Bradley on multiple occasions and in two specific locations. (Doc. 49-3).

Even if a child's testimony may be inadmissible in court, "perhaps because of an inability to understand their oath . . . their statements could nonetheless be used as a basis for a probable cause determination to support the issuance of a warrant." *Easton*, 776 F.2d at 1450. Further, "[t]he existence of inconsistencies in their statements does not change this principle of law in the least." *Id.* As the Tenth Circuit has observed:

> In a great many child molestation cases, the only available evidence that a crime has been committed is the testimony of children. To discount such testimony from the outset would only serve to discourage children and parents from reporting molestation incidents and to unjustly insulate the perpetrator of such crimes from prosecution.

*Id.* at 1449.

Here, Underwood's affidavit included certain details of C.W.'s interview that suggested their trustworthiness. For example, C.W. provided details regarding the specific locations where abuse allegedly occurred. She used the word "vibrator," which Underwood believed a six-year-old ordinarily would not know. *See id.* at 1450 (noting, among other indicia of reliability, that child's statements "were spontaneous and revealed knowledge of things that a child his age could not possibly possess had an event of the kind described not occurred"). C.W.'s statements were also materially consistent with respect to the details C.W. had reported to her grandmother and subsequently repeated to her mother on June 21, 2012.[8] Further, Bradley points to no evidence that C.W.'s statements implicated any person other than Bradley or were otherwise materially inconsistent. Based on these undisputed facts, Deputy Underwood's affidavit was supported by probable cause.

Bradley contends that Amanda's purported statement to Underwood calls into question the reliability of C.W.'s statements, such that Underwood lacked reasonably trustworthy information to support probable cause. However, there is no evidence that Amanda disclosed any factual information inconsistent with C.W.'s account. Rather, viewed in the light most favorable to Bradley, the evidence, at most, would show that, days after the initial report to the CCSO, Amanda said "that she thought maybe it could have been someone else." (Doc. 61-8 at 23:12-24:9). Such speculation does not vitiate the probable cause that was established by the first-hand report by C.W., in which she described Bradley touching her with his finger, penis, and a pink vibrator. *See Easton*, 776 F.2d at 1450 (noting that certain inconsistencies "do nothing to undermine the solid

---

[8]     The fact that the statements of Amanda (and Krista) consist of hearsay does not prevent them from being used to support probable cause. *See Cortez*, 478 F.3d at 1118 n. 10 ("No one disputes that hearsay (with sufficient indicia of reliability) may be considered as a part of the totality of the circumstances in making a probable cause determination.").

core of the children's statements regarding the . . . assault and the location of the perpetrator's apartment").

Even when a parent reports to police that she did not initially believe her child's allegation because her child had previously lied, such information does not negate probable cause that was established by the child's own report:

> [The plaintiff] points out that L.M.'s parents initially disbelieved her account because she had lied in the past. But Officer Fenton wasn't obligated to ignore L.M.'s statements just because she had previously lied in another context. After all, "[a] witness may be inaccurate, contradictory and even untruthful in some respects and yet be entirely credible in the essentials of [her] testimony." As the district court observed, someone who has lied before can still be raped or witness a rape. So it is that modifying the affidavits to include the mother's initial disbelief of her daughter wouldn't have negated probable cause. And that is particularly the case when the affidavit would also have reflected the mother's ultimate decision to inform the police.

*Hopper v. Fenton*, 665 F. App'x 685, 687 (10th Cir. 2016) (unpublished).

Bradley contends that, if Underwood had investigated Amanda's purported statement, she would have discovered that Amanda had a relationship with a registered sex offender, Bryan Anderson, C.W. had stayed the night at Anderson's house, and there was a possible history of sexual abuse in Amanda's family.[9] Certainly, Bradley might have sought to present evidence of these circumstances in his defense in a criminal trial. However, probable cause "does not require proof beyond a reasonable doubt or even a preponderance of the evidence." *Hopper v. Fenton*, 665 F. App'x 685, 686 (10th Cir. 2016), *reh'g denied* (unpublished). Rather, "the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring

---

[9]      Amanda testified that she and C.W. stayed at the home of Amanda's former boyfriend, Bryan Anderson, who was a registered sex offender, on one occasion in December 2011. (Doc. 61-2 at 8-9 [Dep. pp. 36:11-37:10]). DHS at some point investigated an anonymous tip alleging that Amanda was exposing C.W. to Anderson. According to Amanda's deposition testimony, DHS determined that the allegation was untrue. (Doc. 49-2 at 82:18-83:3).

something more than bare suspicion." *Id.* (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)). While "police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation," *Cortez*, 478 F.3d at 1117 (citing *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998)), "once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect," *id.* at 1121 n. 3.

Moreover, including in the affidavit the information about C.W. having spent a night in a sex offender's home and about possible sexual abuse in Amanda's family would not have negated probable cause. *See Hopper*, 665 F. App'x at 687. That is because, notwithstanding such information, C.W. could still have been sexually abused by Bradley, as she consistently reported to her mother, grandmother, and Deputy Underwood. Also, there could be sexual abuse in Amanda's family *and* Bradley could have sexually abused C.W.; the two are not mutually exclusive propositions. Likewise, even had there been an allegation that Anderson sexually abused C.W. (which has not been alleged), C.W. could also have been sexually abused by Bradley.

It is undisputed that C.W. implicated Bradley in sexual abuse during the interview with Deputy Underwood. C.W. identified the specific locations where alleged abuse occurred. Amanda's initial oral and written statements also reported that C.W. had consistently identified Bradley as her abuser. The circumstances of Amanda's relationship with Anderson and potential sexual abuse in Amanda's family, had they been discovered in Underwood's investigation, do not undermine the "solid core" of the allegations as stated in the Creek County Affidavit. *Easton*, 776 F.2d at 1450; *see also Hopper*, 665 F. App'x at 686. C.W. described abuse occurring at the homes which C.W. occupied with her mother and Bradley: the home of *Bradley's* brother, Daniel, in Pawnee County; and the home of C.W.'s grandmother in Creek County. C.W.'s identification of

the alleged sexual abuser was unequivocal; she consistently and repeatedly identified Bradley. In contrast, C.W. did not report any sexual abuse by Anderson or indicate that any abuse happened at Anderson's home.

Bradley also argues that Underwood's investigation was so flawed that it could not have produced reasonably trustworthy information to support a probable cause finding. Bradley's brief recites a series of alleged errors and deficiencies in Underwood's investigation, including that Underwood (a) failed to secure an independent forensic interviewer; (b) failed to form an interagency multidisciplinary team to advise the investigation; (c) used leading and suggestive questions in the forensic interview of C.W.; and (d) "had no physical evidence linked Bradley to the alleged crime." (*See* Doc. 61 at 11-12, ¶ 13).[10]

Bradley relies on *Cortez* to argue that, due to the alleged flaws, Underwood's investigation could not have produced reasonably trustworthy information to support probable cause. *Cortez* is inapposite. In *Cortez*, the "only information which arguably implicated [the plaintiff] was a statement attributed to a barely-verbal two-year old that her babysitter's 'boyfriend' had 'hurt her pee pee' [and] was relayed by telephone to the officers, from the nurse, who heard it from the mother who ostensibly heard it from the two-year old." 478 F.3d at 1117. Officers immediately

---

[10]     In support of his allegation regarding the absence of physical evidence linking Bradley to the alleged sexual abuse, Bradley cites testimony by Deputy Mahoney and an affidavit of Michael D. Lyman, Ph.D., who is a police practices expert. (*See* Doc. 61 at 12 [citing Mahoney Dep., Doc. 61-11 at 46:15-22 and Lyman Affidavit, Doc. 61-9]). Neither of those witnesses are medical experts. (*See* Doc. 61-11 at 8 [Dep. p. 46:21-22: "I'm not a medical expert"]; Doc. 61-9 [credentials in policing]). They are accordingly not qualified to render opinions regarding the likelihood of a physical examination revealing evidence of sexual abuse. The Court will not consider Dr. Lyman's opinion with respect to the absence of a physical examination. Also, Lyman's opinion that "there might have been physical trauma or evidence that would support the allegations" is simply speculative and not reliable or based upon any identifiable methodology. *See* Fed. R. Evid. 702; *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1134 (10th Cir. 2009) (expert's opinion may be disregarded where the expert is either unqualified to render the opinion or his opinion is unreliable); *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

arrested the plaintiff, without interviewing the child or the mother, and they did not seek an arrest warrant. The Tenth Circuit held that "the duty to investigate prior to a warrantless arrest is obviously applicable when a double-hearsay statement, allegedly derived from a two-year-old, is the only information law enforcement possesses." 478 F.3d at 1122. The officers were not entitled to qualified immunity where they "conducted no investigation," relying instead "on the flimsiest of information conveyed by a telephone call." 478 F.3d at 1117-18.

Here, while Bradley faults Underwood's investigative decisions, he does not contend that Deputy Underwood failed to conduct any investigation at all or that a warrantless arrest occurred. Rather, the undisputed facts establish that Underwood interviewed the child, who described sexual abuse by Bradley, after receiving reports from the child's mother and grandmother that the child had similarly reported to them abuse by Bradley. Unlike the plaintiff in *Cortez*, Bradley was *not* immediately arrested without a warrant or any investigation. *Cortez* is plainly distinguishable.

For the reasons set forth above, Bradley has failed to present evidence that Underwood knowingly or recklessly omitted from her affidavit any information that would have vitiated probable cause if it had been included. Accordingly, the Court finds there was probable cause for Bradley's arrest, and his constitutional rights were not violated. Underwood is therefore entitled to qualified immunity as to Bradley's § 1983 claims.[11]

B.      **Oklahoma Constitutional Claim**

Bradley's Complaint also alleges a violation of his rights under the Oklahoma Constitution, which protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." Okla. Const. art. II, § 30. His claim is based on

---

[11]     Because Plaintiff has not established a violation of his constitutional rights, it is not necessary to proceed to the "clearly established law" step of the qualified immunity analysis.

*Bosh v. Cherokee County Building Authority*, in which the Oklahoma Supreme Court recognized

a cause of action by a pre-trial detainee alleging excessive force in violation of Article II, Section

30 of the Oklahoma Constitution. 305 P.3d 994 (Okla. 2013), *superseded by statute*, *see Barrios*

*v. Haskell Cty. Pub. Fac. Auth'y*, 432 P.3d 233 (Okla. 2018).

Bradley's state constitutional claim against Deputy Underwood is not recognized in

Oklahoma law. Since *Bosh*, the Oklahoma Supreme Court has continued to narrow its holding in

*Bosh. See, e.g., Perry v. City of Norman*, 341 P. 3d 689, 692-93 (Okla. 2014); *Barrios*, 432 P.3d

233.[12] The federal courts in Oklahoma have also recently declined to extend *Bosh* to constitutional

claims other than for the use of excessive force. *See Dodson v. Cty. Comm'rs of Mayes Cty.*, 18-

CV-221-TCK-FHM, 2019 WL 2030122 (N.D. Okla. May 8, 2019); *Snow v. Board of County*

*Commissioners of the County of McClain*, Civ-14-911-HE, 2014 WL 7335319, at *3 (W.D. Okla.

Dec. 19, 2014) (declining to recognize a *Bosh* claim for due process rights violations, cruel and

unusual punishment and unreasonable searches and seizures); *Payne v. Oklahoma*, CIV-15-10-

JHP, 2015 WL 5518879, at **3-4 (E.D. Okla. Sept. 17, 2015) (refusing to expand *Bosh* to claims

of due process rights violations, cruel and unusual punishment, and unreasonable search and

seizure claims). The federal courts typically decline to expand state law to an extent not addressed

by the state's highest court. *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013). As

the Oklahoma Supreme Court noted in *Barrios*, "expanding tort remedies for constitutional

---

[12]       In 2014, the Legislature also "responded to *Bosh* by amending the GTCA to specify that
the State's immunity from suit extended even to torts arising from alleged deprivations of
constitutional rights." *Barrios v. Haskell Ct. Pub. Fac. Auth.*, 432 P.3d 233, 238-39 (Okla. 2018);
§ 152(14) (re-defining "tort" to include violations of the "Constitution of the State of Oklahoma");
*id.*, § 153(B) (providing that liability of a political subdivision under the GTCA "shall be exclusive
and shall constitute the extent of tort liability of the state, a political subdivision or employee
arising from common law, statute, the Oklahoma Constitution, or otherwise."). The 2014
amendment became effective after Plaintiff filed his Complaint in this action.

violations is now a 'disfavored judicial activity.'" *Barrios*, 432 P.3d at 240 (quoting *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843 (2017)).

Even were this Court to extend *Bosh* to recognize a state constitutional claim under the facts alleged by Bradley in this case, *Bosh* addressed respondeat superior liability and did not purport to create individual liability. Bradley has not identified legal authority providing for individual liability under *Bosh*. Other federal courts in Oklahoma have declined to extend *Bosh* to claims against individuals. *Shed v. Oklahoma ex rel. Okla. Dep't of Human Servs.*, No. 16-383-RAW, 2017 WL 1496039, at *3 (E.D. Okla. Apr. 25, 2017) ("*Bosh* claims appear to be limited to actions against political subdivisions."); *Smith v. Hedgecock*, No. 18-CV-46-JHP, 2018 WL 3478893, at *6 (E.D. Okla. Jul. 19, 2018); *see also Maher v. Oklahoma*, 165 F. Supp. 3d 1089, 1093, n.3 (W.D. Okla. 2016) ("Plaintiff points to no legal authority that permits a *Bosh* claim against an individual actor").

Accordingly, Underwood is entitled to summary judgment on Bradley's Oklahoma Constitutional claim.

## IV. Davis's Motion for Summary Judgment

As Davis is no longer the sheriff, he is only a party to this action in his individual capacity. Bradley's Complaint alleges claims under § 1983 against Davis "under a supervisory liability theory and for his personal involvement and participation in the violation of Plaintiff's rights. . . ." (Doc. 1 at 2, ¶ 6). However, in response to Davis's motion, "Plaintiff concedes that he does not have" viable § 1983 claims against Davis in his individual capacity. (Doc. 63 at 2-3). Accordingly, Davis is entitled to summary judgment, and all claims against Davis are dismissed.

## V. Claims Against Sheriff Bowling

Sheriff Bowling is the current Creek County Sheriff and has been substituted in his official capacity for the former sheriff, Davis. Accordingly, the Court will consider the official capacity

arguments presented in the summary judgment motion originally filed by Davis, as those arguments are applicable to Bowling in his official capacity.

In the § 1983 context, a claim against a state actor in his official capacity "is essentially another way of pleading an action against the county or municipality" he represents. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). To hold a municipality liable under § 1983, a plaintiff must prove (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) (citations omitted); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Because the Court has determined that Bradley has not presented evidence of a constitutional violation, Bradley's municipal liability claim fails. *See, e.g., Hinton v. City of Elwood, Kan.*, 997 F.2d 774, (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers"); *Camuglia v. City of Albuquerque*, 448 F.3d 1214, (10th Cir. 2006) (determining City was also entitled to summary judgment where the court determined that there had been no underlying constitutional violation); *Fisher v. Koopman*, 693 F. App'x 740, 746 (10th Cir. 2017) (unpublished) ("The lack of a constitutional violation likewise dooms the official capacity claims against Detective Koopman and Chief Hecker. . . . Likewise, the failure to train and supervise claim against Chief Hecker fails without a constitutional violation.")

The Sheriff also moves for summary judgment on Bradley's state claims. Under Oklahoma law, a "[s]uit against a government officer in his or her official capacity is actually a suit against the entity that the officer represents and is an attempt to impose liability upon the governmental

entity." *Speight v. Presley*, 203 P.3d 173, 179 (Okla. 2008) (citing *Pellegrino v. State ex rel. Cameron Univ.*, 63 P.3d 535, 537 (Okla. 2003)). Employees sued in such capacity are immune from suit pursuant to GTCA. *Id.* A claim pursuant to GTCA "shall name as defendant the state or political subdivision against which liability is sought to be established." *Okla. Stat.* tit. 51, § 163(C); *see also Speight*, 203 P.3d at 176. An action brought against a county shall name the county's board of commissioners. *Okla. Stat.* tit. 19, § 4.[13] The Oklahoma courts have strictly applied the statutory requirement that suits against a county be brought against its Board of County Commissioners. *See, e.g., Board of Cnty. Comm'rs of the County of Oklahoma v. Weatherford*, 565 P.2d 35, (Okla. 1977) (vacating award against county where the county was not properly named as a party and remanding with directions to dismiss). The Sheriff is immune from suit under the GTCA. *See Okla. Stat.* tit. 51, § 163(C); *Simington v. Parker*, 250 P.3d 351, 358 (Okla. Civ. App. 2011).

Even had Bradley properly named the Board of County Commissioners as required under Oklahoma law, the GTCA specifically provides an exemption from liability pursuant to which "[t]he state or a political subdivision shall not be liable if a loss or claim results from: . . . Execution or enforcement of lawful orders of any court." *Okla. Stat.* tit. 51, § 155(3); *see also North Side State Bank v. Bd. Of Cnty. Comm'rs of Tulsa County*, 894 P.2d 1046, 1050 (Okla. 1994). Because the claim against the Sheriff is the result of an arrest warrant, executed by a Judge of the Creek County District Court, the GTCA exemption would apply.

As noted previously, Oklahoma courts have recently declined to extend *Bosh* to constitutional claims other than the use of excessive force, such that Bradley does not have a claim

---

[13] A recent amendment to the statute provides that certain county officers may be named in some cases. *See* S.B. 484, 57th Leg., 2019 First Reg. Sess. (Okla. 2019) (to become effective November 1, 2019). This amendment is not yet effective.

under the Oklahoma Constitution for any alleged unlawful arrest or malicious prosecution. In any event, the evidence does not support his claim that he was arrested without probable cause or that he was maliciously prosecuted. Bradley's state law claims against Sheriff Bowling do not survive summary judgment.

## VI.    Sheriff Waters's Motion for Summary Judgment

Bradley has also sued Pawnee County Sheriff Mike Waters under Oklahoma law, asserting that Waters is "vicariously liable . . . for Plaintiff's tort claims" and "for the violations of Plaintiff's rights under the Oklahoma Constitution." (Doc. 1 at 14-15, ¶¶ 52, 57). His claims are premised upon the same theories asserted as to Sheriff Bowling. As a result, the claims against Sheriff Waters are subject to dismissal for the same reasons set forth above in Part V above.

## VII.    Conclusion

There is no genuine dispute of material fact, and the defendants are entitled to judgment as a matter of law on Bradley's claims. Accordingly, the motions for summary judgment (Doc. 49, 50, and 52) are **granted**. A final Judgment will be entered forthwith.

SO ORDERED this 24th day of September, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT